UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>ALL PETROLEUM-PRODUCT CARGO<br>ABOARD THE BELLA WITH<br>INTERNATIONAL MARITIME<br>ORGANIZATION NUMBER 9208124,<br><br>ALL PETROLEUM-PRODUCT CARGO<br>ABOARD THE BERING WITH<br>INTERNATIONAL MARITIME<br>ORGANIZATION NUMBER 9149225,<br><br>ALL PETROLEUM-PRODUCT CARGO<br>ABOARD THE PANDI WITH<br>INTERNATIONAL MARITIME<br>ORGANIZATION NUMBER 9105073,<br><br>     --and--<br><br>ALL PETROLEUM-PRODUCT CARGO<br>ABOARD THE LUNA WITH<br>INTERNATIONAL MARITIME<br>ORGANIZATION NUMBER 9208100,<br><br>     Defendants. | Civil A. No. 20-1791 |

## AFFIDAVIT IN SUPPORT OF ISSUANCE OF WARRANT OF ARREST *IN REM*

I, Thomas Tamsi, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

1.    I make this affidavit in support of an application for a Warrant of Arrest *in Rem* for

the defendant properties in this action (further described in Attachment A), pursuant to Rule

G(3)(b)(ii) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions of the Federal Rules of Civil Procedure ("Supplemental Rules"). The defendant properties

are all petroleum-product cargo aboard: the Bella with International Maritime Organization

("IMO") number 9208124 ("Defendant Property 1"), the Bering with IMO number 9149225

("Defendant Property 2"), the Pandi with IMO 9105073 ("Defendant Property 3"), and the Luna

with IMO number 9208100 ("Defendant Property 4") (collectively, the "Defendant Properties").

There is probable cause to believe that the Defendant Properties are subject to seizure and

forfeiture as described herein.

     2.    I am a Special Agent of the United States Department of Homeland Security

("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations

("HSI"), and have been since November 2007. I am currently assigned to the Counter Proliferation

Investigations Group at the HSI Office of the Special Agent in Charge in Denver, Colorado. Prior

to my employment with HSI, I worked as a Special Agent with the U.S. Department of Defense

("DOD") Defense Logistics Agency Criminal Investigations Activity from March 2003 to

November 2007 and as a Special Agent with the U.S. Air Force Office of Special Investigations

from May 1999 to March 2003. I am a graduate of the Criminal Investigator Training Program at

the Federal Law Enforcement Training Center. My duties as a Special Agent for HSI include, but

are not limited to, investigating violations of federal law, including the illegal export of arms and

strategic technology commodities from the United States and violations of the Bank Secrecy Act

and Money Laundering Control Act.I am familiar with the federal laws relating to the unlawful

export of arms and commodities from the United States. I have received training related to

identifying the techniques methods, and procedures employed by groups, organizations,

companies, corporations, and individuals to export goods and commodities in violation of United

States laws, as well as laundering funds related to such transactions into and out of the United States. In addition, I have received specific instruction and training on conducting criminal investigations associated with export law violations, and have participated in numerous such investigations.

3.     The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on materials that I have reviewed, and on my training and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Because this affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation. Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of the government's application for a warrant to seize the Defendant Properties.

5.     Specifically, based on the facts set forth in this affidavit, there is probable cause to believe that the Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(1), as foreign assets of the Islamic Revolutionary Guard Corps ("IRGC"), a designated foreign terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property, and as assets, or sources of influence by a person or entity over the IRGC.

## II.     BACKGROUND

### A.     IRGC

6.      On April 8, 2019, the President designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively finances and promotes terrorism.  On April 15, 2019, the Secretary of State designated the IRGC, including the IRGC-QF, as Foreign Terrorist Organization.  *See*  https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/. According to the Department of the Treasury, the IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry and the profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of WMD and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad. *See* https://home.treasury.gov/news/press-releases/sm703.

### B.     Forfeiture Authorities

7.      Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), all assets, foreign or domestic, of an organization engaged in planning or perpetrating any federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, are subject to civil forfeiture, as are all assets, foreign or domestic, affording any person a source of influence over any such entity or organization.

8.      The relevant forfeiture statute, 18 U.S.C. § 98l(a)(l)(G)(i), covers two categories of property relating to any individual, entity, or organization engaged in planning or perpetrating any federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property: (1) all assets, foreign or domestic of such individual, entity, or organization; and (2) all assets, foreign and domestic, affording any person a

source of influence over the terrorist entity or organization. "That is, the statute empowers the government to seek the forfeiture of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations." *United States v. One Gold Ring with Carved Gemstone*, No. 16-CV-02442-TFH, 2019 WL 5853493, at *1 (D.D.C. Nov. 7, 2019).

9.      "[T]he Court must therefore give effect to [the Secretary of State's] adjudication[]" that the IRGC is a Foreign Terrorist Organization, *see In re 650 Fifth Ave.*, No. 08-cv-10934, 2013 WL 2451067, at *6 (S.D.N.Y. June 6, 2013). "Foreign Terrorist Organizations [] are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act []." https://www.state.gov/foreign-terrorist-organizations/. Such designations require: a "foreign organization"; that is engaged in "terrorist activity" or "retains the capability and intent to engage in terrorist activity or terrorism;" and such activity or terrorism "must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States." *Id.*

10.      The terrorism forfeiture provision, 18 U.S.C. § 98l(a)(l)(G)(i), cross references 18 U.S.C. § 2332b(g)(5), which defines "a federal crime of terrorism" to include an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and, *inter alia*, violates 2339B (relating to providing material support to "terrorist organizations"). Purusant to § 2339B, a "terrorist organization" is defined as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act," *i.e.*, a designated Foreign Terrorist Organization by the Secretary of State. 18 U.S.C. § 2339B(g)(6). Thus, once an entity is designated a Foreign Terrorist Organization, it automatically comes within the scope of 18 U.S.C. § 98l(a)(l)(G)(i) as such

individual, entity, or organization is necessarily engaged in planning or perpetrating a federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property. *See United States v. Puerta*, 249 F. App'x 359, 360 (5th Cir. 2007) (defendant's conviction fell squarely within the definition of a "federal crime of terrorism" in § 2332b(g)(5), because he provided material support to a "designated foreign terrorist organization" in violation § 2339B).

11.     Furthermore, OFAC, which has "unique expertise in matters of terrorist finance," *In re 650 Fifth Ave.*, 2013 WL 2451067, at *6, has tied the financing of terrorism on numerous occasion to petroleum sales by the IRGC. *See e.g.*, https://home.treasury.gov/news/press-releases/sm767. OFAC concluded that "in spring 2019 alone, [one] IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil . . . which sold for more than half a billion dollars." *Id.* According to OFAC, the proceeds of "[t]his vast oil-for-terror shipping network" fund "violent acts of terrorism." *Id.*

12.     "This court is the sole jurisdiction where such litigation is properly lodged. 28 U.S.C. § 1355(b)(2)." *One Gold Ring with Carved Gemstone*, 2019 WL 5853493, at *1.

13.     Moreover, this court has jurisdiction for property subject to forfeiture on the high seas, pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b).

## III.     PROBABLE CAUSE STATEMENT

### A.     Importance of Petroleum and Shipping Industries to the IRGC

14.     On September 24, 2012, the U.S. Department of the Treasury submitted its report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), informing Congress that the Department of the Treasury determined that the National Iranian Oil Company ("NIOC") was an agent or affiliate of the IRGC.

15.     In 2014, the Department of the Treasury further noted that under the current Iranian regime, the IRGC's influence has grown within NIOC. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia Construction Headquarters, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC. As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process. *See* https://ir.usembassy.gov/our-relationship/official-reports/treasury-report-nioc-nitc/.

16.     On June 7, 2019, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") took action against Persian Gulf Petrochemical Industries Company ("PGPIC") for providing financial support to Khatam al-Anbiya. PGPIC is Iran's largest and most profitable petrochemical holding group. PGPIC and its group of subsidiary petrochemical companies hold 40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports "By targeting this network we intend to deny funding to key elements of Iran's petrochemical sector that provide support to the IRGC," said Treasury Secretary Steven T. Mnuchin. "This action is a warning that we will continue to target holding groups and companies in the petrochemical sector and elsewhere that provide financial lifelines to the IRGC."

17.     As recently as January 23, 2020, OFAC described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") and its terrorist proxies. Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its

malign activities throughout the Middle East."   https://home.treasury.gov/news/press-releases/sm885.

18.     OFAC has also noted that crude oil and condensate sold by the IRGC-Quds Force originates with NIOC, and that the IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things. Furthermore, National Iranian Tanker Company ("NITC") vessels have been used in IRGC-QF-run operations.  *See* https://home.treasury.gov/news/press-releases/sm767.

19.     Since September 2018, the IRGC-QF has moved oil through a sanctioned shipping network, which features dozens of ship managers, vessels, and facilitators. This complex network of intermediaries enables the IRGC-QF to obfuscate its involvement in selling Iranian oil.

20.     OFAC concluded that in spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, and has taken steps to hide Iranian, IRGC and NIOC involvement in certain transactions. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars.

21.     The profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad. "The IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities," said then-Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker.  https://home.treasury.gov/news/press-releases/sm703..

**B.     Background on Entities Involved in Present Scheme and Their Prior Relevant Activities**

22.     A confidential reliable source stated that Mahmoud Madanipour was the Iran-based individual who arranged the shipments of the Defendant Properties on behalf of Mobin International Ltd. ("Mobin International").  According to a confidential reliable source, Mahmoud Madanipour is affiliated with the IRGC.

23.     Mobin International changed its name within the past two years. Mobin International previously described itself as an Iranian petroleum company, operating under the name Rahbaran Petro Mobin Kish.

24.     Mobin International and/or Madanipour are also affiliated and/or associated with another U.A.E.-based trading company ("Company 1").

25.     According to a confidential reliable source, Mobin International is associated with bank accounts also used for IRGC funds.

26.     A confidential reliable source has also stated that, during planning discussions regarding sanctions evasion, Madanipour said that any business conducted by foreign entities would require IRGC consent. Madanipour also said that in order to conceal IRGC involvement, the government of Iran had officially retired numerous IRGC leaders and then placed them at the heads of companies in key Iranian industrial sectors.

27.     Madanipour, through Mobin International, works closely with NIOC and entities associated with NIOC and the IRGC, and has taken steps to conceal Iranian, IRGC, and NIOC involvement in previous petroleum-product transactions.  For example:

   a.  On or about March 17, 2019, Mobin International confirmed with Naftiran Intertrade Company Ltd.—a Swiss-based Iranian oil trading company designated by OFAC for its connections to NIOC—an agreement for storage in Malaysia and UAE. The letter stated, "Our partner company who owns several Tankers and one

Bunkering Company (Owner) needs to be secured of any risk of sanctions on person, assets and licenses in the future. Therefore, we are setting up a new joint venture ship management company in one of the GCC countries to handle all our transshipments of risky oil business."

b. On or about April 7, 2017, Madanipour corresponded with an associate, discussing a proposal to sell crude oil to a company in China. The associate asked a question on behalf of the Chinese, "[t]hey want to know if we can make the product origin not Iran as they are worried of sanctions - is Oman option there as it is not part of OPEC?" Madanipour responded, "Yes we will provide from Oman."

    i.  The associate asked, "Can the make payment to other countries no[t] Iran but maybe to any of the GCC countries like Oman or Dubai or which would be ok for you."

    ii.  Madanipour responded, "We can get payment in Oman, UAE, Turkey, Italy and Germany."

c. On or about July 9, 2017, an employee in the product operation division at NIOC contacted Madanipour for details on a gasoline contract. The request was directed to the attention of Rahbaran Petro Mobin Kish and included numerous other NIOC employees.

d. On or about July 9, 2017, Madanipour caused a ship-to-ship transfer of one million barrels of oil supplied by the NIOC from Kharg Island, Iran.

28.    As part of its role in the scheme described, Mobin International has also altered documents to camouflage the true nature of petroleum-product sales.  For example, on or about July 26, 2018, Madanipour discussed Mobin International's right to issue and switch a bill of

lading relating to a NITC shipment, and Madanipour has documented the cost to "[s]witch documents" to be $30,000.00.

29.     A letter dated April 16, 2020, sent to the owners of another ship ("Vessel 1"), referenced a transaction between NIOC and Mobin International. The letter stated that the charterer could not obtain the original bills of lading, and thus could not switch: (1) the true bills of lading from NIOC to fraudulent documents purportedly from the Iraqi State Organization for Marketing of Oil; and (2) the consignee from Mobin International to the name of another company. The letter sought to indemnify each party should the vessel be arrested or detained as a result of the inability to switch the bills of lading.  Additionally:

    a.  a manifest dated March 19, 2020, lists the National Iranian Oil Products Distribution Company ("NIOPDC") as the shipper of gasoline onboard Vessel 1; and

    b.  subsequently, the Pandi, one of the ships used in the current voyage, engaged in a ship-to-ship transfer with Vessel 1 in the Port Khalid, Sharjah, UAE to take on the Iranian gasoline.

30.     On or about May 20, 2019, Madanipour learned that Mobin International was allegedly being sued by NIOC for failing to pay its debts and that Madanipour was being sued by the Persian Gulf Petrochemical Company and others for failing to pay his debts.

**C.     Current Voyage Arranged by Mobin International from Iran to Venezuela**

31.     Four petroleum tankers, the Bella, the Bering, the Pandi, and the Luna, are in the process of transporting Iranian gasoline (i.e., the Defendant Properties) to Venezuela.

32.     A reliable confidential reliable source revealed that in January 2020, Company 1 requested that the owner of the Pandi carry gasoline from Iran to the UAE.  The charter for this

voyage was fixed on January 3, 2020.  The charter party was Company 1, represented by Madanipour, and the shipper was the NIOPDC.  Madanipour subsequently changed the documents to reflect that Mobin International, as opposed to Company 1, was responsible for this voyage.

33.     The Bella, Bering, Pandi, and Luna were ultimately contracted by Mobin International to transport the Defendant Properties.  Mobin International selected Seawaves Shipping, an Iranian company, to act as its agent.

34.     According to a confidential reliable source, Seawaves Shipping is associated with the IRGC-QF.

35.     A Bill of Lading, dated January 10, 2020, documented the gasoline onboard the Pandi, and listed the shipper as NIOC. The consignee was listed as "To Order of Shipper (NIOPDC) Account of Mobin International Ltd."

36.     On or about February 27, 2020, Company 1 invoiced a company called The Avantgarde Group for a $14.9 million cash payment for the sale of gasoline aboard the Pandi. Such invoicing was consistent with a pre-existing relationship between Company 1 and Mobin International.  For example, on or about February 4, 2018, an Emirati trading company sent an account statement that reflected "[Company 1] (on behalf of Mobin)" transferred funds to a "NITC account."

37.     The Avantgarde Group has previously been connected to the IRGC.

      a.  The Avantgarde Group has received payments from Mohammad Saeed Al Aqili and the Al Aqili Group.  On April 29, 2014, OFAC designated Mohammad Saeed Al Aqili and the Al Aqili Group, for assisting the Iranian regime in selling oil in evasion of U.S. trade/economic sanctions.  OFAC noted in the designation that the

Al Aqili Group arranged oil sales for the IRGC and facilitated the circumvention of oil sanctions by disguising the oil's origin.

b.   Additionally, ACS Trading LLC is based in UAE and is part of the Avantgarde Group. ACS Trading facilitated the purchase of Grace 1, an IRGC-controlled vessel which was subject to a civil and criminal forfeiture complaint in the United States District Court for the District of Columbia. The IRGC publicly acknowledged that the vessel was operating on its behalf.

38.   Publicly-available satellite tracking data known as the automated identification system ("AIS") revealed that in March 2020, the Pandi visited the Sirus Oil Terminal in Iran. AIS additionally shows that the Pandi engaged in a ship-to-ship transfer of Defendant Property 1 to the Bella on or about April 17, 2020.

39.   On or about April 18, 2020, the Bella set sail with Defendant Property 1 on board. The certificate of origin and bill of lading for Defendant Property 1 falsely show UAE origin cargo. The documents accurately reflect the charter party as Mobin International. Defendant Property 1 is approximately 302,502 barrels of Iranian gasoline currently on board the Bella, which property was ultimately destined for Venezuela.

40.   On or about April 14, 2020, the Bering entered into an agreement to transport Iranian gasoline for Mobin International.  The Bering subsequently on boarded Defendant Property 2 via a ship-to-ship transfer.  Defendant Property 2 is approximately 302,522 barrels of Iranian gasoline currently on board the Bering, which property was ultimately destined for Venezuela.

41.   On or about April 14, 2020, the Luna entered into an agreement to transport Iranian gasoline for Mobin International.  The Luna subsequently on boarded Defendant Property 4 via

two ship-to-ship transfers.  Defendant Property 4 is approximately 259,700 barrels of Iranian gasoline currently on board the Luna, which property was ultimately destined for Venezuela.

42.    On or about May 11, 2020, the Pandi entered into an agreement to transport Iranian gasoline for Mobin International.  The Pandi subsequently on boarded Defendant Property 3 via a ship-to-ship transfer.  Defendant Property 3 is approximately 298,484 barrels of Iranian gasoline currently on board the Pandi, which property was ultimately destined for Venezuela.

43.    A text message between Madanipour and a co-conspirator noted difficulties in the voyage for both the Bella and the Bering.  The co-conspirator texted, "the ship owner doesn't want to go because of the American threat, but we want him to go, and we even agreed We will also buy the ship."

## IV. CONCLUSION

44.    Based on the facts described above, there is probable cause to believe that the Defendant Properties are subject to seizure and forfeiture.

Respectfully submitted,

/s/ *Thomas Tamsi*
Thomas Tamsi
Special Agent
Homeland Security Investigations

Dated: July 1, 2020