UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALL PETROLEUM-PRODUCT CARGO ABOARD THE BELLA WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9208124, *et al.*,<br><br>Defendants In Rem,<br><br>- and –<br><br>MOBIN INTERNATIONAL LIMITED, *et al.*,<br><br>Claimants. | Civil Action No. 20-1791 (JEB) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR ENTRY OF DEFAULT JUDGMENT**

The United States of America, by undersigned counsel, submits this memorandum of law in support of its motion for default judgment. This in rem forfeiture action arises from an investigation of Iran's transportation and sale of oil products to benefit sanctioned Iranian entities and seeks to forfeit petroleum that was aboard four ships en route from Iran to Venezuela. On July 1, 2020, the United States filed a verified complaint in rem against the defendant properties, namely: (1) all petroleum-product cargo aboard the Bella with International Maritime Organization ("IMO") number 9208124 ("Defendant Property 1"); (2) all petroleum-product cargo aboard the Bering with IMO number 9149225 ("Defendant Property 2"); (3) all petroleum-product cargo aboard the Pandi with IMO number 9105073 ("Defendant Property 3"); and (4) all petroleum-product cargo aboard the Luna with IMO number 9208100 ("Defendant Property 4") (collectively

the "Defendant Properties"). *See* Compl. (ECF No. 1) at 1-2. The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as assets affording a source of influence over the Islamic Revolutionary Guard Corps ("IRGC"), a designated foreign terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property.

The Clerk of Court entered default against the Defendant Properties on April 29, 2021. *See* Entry of Default (ECF No. 29). Accordingly, this matter is now ripe for entry of default judgment and the United States requests forfeiture of the Defendant Properties.

## FACTUAL BACKGROUND

As noted below, on a motion for default judgment, the Court should assume the truth of the well-pled factual allegations set forth in the complaint. *See, e.g., Hartford Fire Ins. Co. v. Vista Contracting, Inc.*, Civ. A. No. 16-285 (JDB), 2016 U.S. Dist. LEXIS 161497, at *5 (D.D.C. Nov. 22, 2016) ("Once default is entered by the clerk, the court assumes that all allegations in the well-pleaded complaint are true for the purpose of determining whether to enter default judgment.") (citation omitted). Those allegations (with citations to other supporting materials) are summarized below.

### A.    Relevant Individuals and Entities

### I.    Islamic Revolutionary Guard Corps

The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The Islamic Revolutionary Guard Corps – Quds Force ("IRGC-QF") is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations. The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking."

https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.    According to the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), "[t]he IRGC and its major holdings, such as the Basij Cooperative Foundation and Khatam al-Anbiya, have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses." https://home.treasury.gov/news/press-releases/sm703; *see also* Compl. ¶¶ 8, 14.

The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil.  Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries … to obfuscate its involvement in selling Iranian oil."    https://home.treasury.gov/news/press-releases/sm767; *see also* Compl. ¶ 12; https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.").

The IRGC generates substantial revenues from the sale of petroleum products.  For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime.  These shipments, taken collectively, sold for more than half a billion dollars.  The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars."  https://home.treasury.gov/news/ press-releases/sm767; *see also* Compl. ¶ 13.  OFAC has found that "[t]he profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for

terrorism, and a variety of human rights abuses, at home and abroad." https://home. treasury.gov/news/press-releases/sm703; *see also* Compl. ¶¶ 8, 14.

On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx. In part, OFAC found that "[t]he Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)." *Id.* On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF. *See* https://www.treasury.gov/press-center/press-releases/Pages/ sm0177.aspx.

On April 8, 2019, the President announced that he would designate the IRGC as Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). *See* Compl. ¶ 8; https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/. The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism." https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/. On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA. *See* Compl. ¶ 8; 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.

federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

## II.    National Iranian Oil Company

The National Iranian Oil Company ("NIOC"), which is overseen by the Iranian Ministry of Oil, "is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran."  https://home.treasury.gov/news/press-releases/sm1165.  According to OFAC, NIOC is "instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies.  Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and fund its malign activities throughout the Middle East." https://home.treasury.gov/news/press-releases/sm885; Compl. ¶ 10.

OFAC has found that NIOC supplies crude oil and condensate sold by the IRGC-QF.  *See* Compl. ¶ 11; https://home.treasury.gov/news/press-releases/sm767.  On September 24, 2012, the Department of the Treasury reported to Congress that it had determined that NIOC was an agent or affiliate of the IRGC.  *See* Compl. ¶ 6; https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.  On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF."  *See* https://home.treasury.gov/news/press-releases/sm1165.

## III.    National Iranian Tanker Company

The National Iranian Tanker Company ("NITC"), a subsidiary of NIOC, is "responsible for the transportation of Iranian crude exports."    https://home.treasury.gov/news/press-releases/sm1165.  According to OFAC, "NIOC and NITC provide both the oil and tankers for the

sale of Iranian oil by the IRGC-QF." *Id.*  On October 26, 2020, OFAC designated NITC pursuant to Executive Order 13,224 for providing support to the IRGC-QF.  *Id.*

## IV.    National Iranian Oil Products Distribution Company

The National Iranian Oil Products Distribution Company ("NIOPDC") is a subsidiary of NIOC.  *See* https://home.treasury.gov/news/press-releases/sm1165.  On October 26, 2020, OFAC designated NIOPDC pursuant to Executive Order 13,224 for being owned, controlled, or directed by, or having acted or purported to act for or on behalf of, directly or indirectly, the Iranian Ministry of Petroleum.  *Id.*

## V.    Persian Gulf Petrochemical Industries Company

The Persian Gulf Petrochemical Industries Company ("PGPIC") is Iran's largest and most profitable petrochemical holding group.  Compl. ¶ 9.  On June 7, 2019, OFAC designated PGPIC under Executive Order 13,882 for providing financial support to Khatam Al-Anbiya Construction Headquarters, the construction and engineering branch of the IRGC.  *See id.*; https://home.treasury.gov/news/press-releases/sm703.

## VI.    Mahmoud Madanipour and Mobin International

Mahmoud Madanipour is an Iranian national who arranged the shipments of the Defendant Properties on behalf of Mobin International Ltd. ("Mobin International").  *See* Compl. ¶ 15.  Mahmoud Madanipour is affiliated with the IRGC.  *Id.*

Mobin International is a company purportedly organized in the United Arab Emirates that contracted with the Bella, Bering, Pandi, and Luna to transport the Defendant Properties to Venezuela.  *See* Compl. ¶ 26.  Mobin International previously operated under the name Rahbaran Petro Mobin Kish and described itself as an Iranian petroleum company.  *See id.* ¶ 16.  Mobin International is associated with bank accounts also used for IRGC funds.  *See id.* ¶ 18.

On October 26, 2020, OFAC designated Madanipour, Mobin International, and Oman Fuel Trading Ltd. ("Oman Fuel") in connection with the events of this case.  *See* https://home.treasury.gov/news/press-releases/sm1165.  OFAC designated Mobin International pursuant to Executive Order 13,224 for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of the NIOPDC. *Id.*  OFAC designated Madanipour for having acted for or on behalf of Mobin International.  *Id.* OFAC designated Oman Fuel for being owned, controlled, or directed by Madanipour.  *Id.*

In announcing the designations, OFAC explained that "[i]n January 2020, Mahmoud Madanipour (Madanipour) and UAE-based Mobin International Limited (Mobin) entered into an agreement with designated Venezuelan state-owned oil company Petroleos de Venezuela, S.A. (PdVSA) to ship gasoline obtained from NIOC to the illegitimate Maduro regime in Venezuela. Upon the request of NIOC's subsidiary NIOPDC, Madanipour and Mobin chartered multiple vessels to support the transport of tens of thousands of metric tons of gasoline destined for Venezuela." *Id.*

### VII.    Mohammad Saeed Al Aqili and the Al Aqili Group

On April 29, 2014, OFAC designated Mohammad Saeed Al Aqili and the Al Aqili Group "pursuant to [Executive Order] 13645 for providing support in connection with deceptive oil deals for Iran."   https://www.treasury.gov/press-center/press-releases/Pages/jl2372.aspx;  *see also* Compl. ¶ 30.  OFAC found that the Al Aqili Group had "arrang[ed] oil sales for the IRGC and facilitate[ed] the circumvention of oil sanctions by disguising the oil's origin." https://www.treasury.gov/press-center/press-releases/Pages/jl2372.aspx; *see also* Compl. ¶ 30.

B.    **The Sale of the Defendant Properties**

In January 2020, Company 1 requested that the owner of the Pandi carry gasoline from Iran to the UAE. *See* Compl. ¶ 25. Company 1 is a U.A.E.-based trading company. *See id.* ¶ 17. The charter for this voyage was fixed on January 3, 2020. *See id.* ¶ 25. The shipping documents for the Pandi initially reflected that the shipper was the NIOPDC and the charter party was Company 1. *Id.* Madanipour subsequently changed the documents to reflect that Mobin International, as opposed to Company 1, was responsible for this voyage. *Id.* However, a bill of lading for the gasoline onboard the Pandi, which was dated January 10, 2020, indicated that the shipper was NIOC and listed the consignee as "To Order of Shipper (NIOPDC) Account of Mobin International Ltd." *Id.* ¶ 28.

Mobin International ultimately contracted to transport the Defendant Properties on the Bella, Bering, Pandi, and Luna. *See* Compl. ¶ 26. Mobin International selected Seawaves Shipping, an Iranian company, to act as its agent for the shipments. *Id.* Seawaves Shipping is associated with the IRGC-QF. *See id.* ¶ 27.

On or about February 27, 2020, Company 1 issued an invoice to the Avantgarde Group for a $14.9 million cash payment for the sale of gasoline aboard the Pandi. *See* Compl. ¶ 29. Such invoicing was consistent with a pre-existing relationship between Company 1 and Mobin International. *Id.* The Avantgarde Group has previously been connected to the IRGC and has received payments from Mohammad Saeed Al Aqili and the Al Aqili Group. *See id.* ¶ 30. Additionally, ACS Trading LLC, which is based in the UAE and is part of the Avantgarde Group, facilitated the purchase of the Grace 1, an IRGC-controlled vessel, which was subject to a prior civil and criminal forfeiture complaint in this Court. *See id.* ¶ 30. The IRGC publicly acknowledged that the Grace 1 was operating on its behalf. *Id.*

Publicly available satellite tracking data known as the automated identification system ("AIS") revealed that in March 2020, the Pandi visited the Sirus Oil Terminal in Iran.  *See* Compl. ¶ 31.  AIS additionally shows that the Pandi engaged in a ship-to-ship transfer of Defendant Property 1 to the Bella on or about April 17, 2020.  *Id.*  On or about April 18, 2020, the Bella set sail with Defendant Property 1 on board.  *See id.* ¶ 32.  The certificate of origin and bill of lading for Defendant Property 1 falsely showed that the cargo originated in the UAE, but the documents accurately reflected that the charter party was Mobin International.  *Id.*  Defendant Property 1 is approximately 302,502 barrels that were on board the Bella and ultimately destined for Venezuela. *Id.*

On or about April 14, 2020, the Bering entered into an agreement to transport Iranian gasoline for Mobin International.  *See* Compl. ¶ 33.  The Bering subsequently loaded Defendant Property 2 via a ship-to-ship transfer.  *Id.*  Defendant Property 2 is approximately 302,522 barrels that were on board the Bering and ultimately destined for Venezuela.  *Id.*

On or about April 14, 2020, the Luna entered into an agreement to transport Iranian gasoline for Mobin International.  *See* Compl. ¶ 33.  The Luna subsequently loaded Defendant Property 4 via two ship-to-ship transfers.  *Id.*  Defendant Property 4 is approximately 259,700 barrels that were on board the Luna and ultimately destined for Venezuela.  *Id.*

On or about May 11, 2020, the Pandi entered into an agreement to transport Iranian gasoline for Mobin International.  *See* Compl. ¶ 34.  The Pandi subsequently loaded Defendant Property 3 via a ship-to-ship transfer.  *Id.*  Defendant Property 3 is approximately 298,484 barrels that were on board the Pandi and ultimately destined for Venezuela.  *Id.*

A text message between Madanipour and a co-conspirator noted difficulties in the voyage for both the Bella and the Bering.  *See* Compl. ¶ 35.  The co-conspirator texted, "the ship owner

doesn't want to go because of the American threat, but we want him to go, and we even agreed We will also buy the ship." *Id.* On August 12, 2020, shortly after the United States took possession of the Defendant Properties in this case, Iranian military forces boarded and briefly seized the MT Wila, a Liberian-flagged oil tanker, in international waters near the Strait of Hormuz. U.S. Central Command published a video showing military forces fast-roping from an Iranian Sikorsky SH-3 Sea King helicopter onto the Wila. *See* https://twitter.com/CENTCOM/status/ 1293678243552395264.

## PROCEDURAL HISTORY

On July 1, 2020, the United States commenced this forfeiture action in rem against the Defendant Properties by filing a verified complaint for forfeiture. *See* Compl. (ECF No. 1). A day later, the Court made a probable cause finding and issued a warrant for arrest in rem. *See* Order (ECF No. 5) (granting warrant for arrest in rem).

On September 1, 2020, the Court issued an order authorizing the interlocutory sale of the Defendant Properties. Order (ECF No. 10). The interlocutory sale order provides in part that "all net proceeds from the Sale, after payment of fees and expenses, shall be held in an interest-bearing account maintained by the Government pending the conclusion of the action." *Id.* The order further provides that "[t]he Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order, including but not limited to, any matter, claim, or dispute arising from or relating to the Government's sale, the sale process, the sale procedures, any purchase and sale agreement for the petroleum products comprising the Defendant Properties, and the implementation of this Order." *Id.*

Pursuant to the Court's interlocutory sale order, the United States sold the Defendant Properties for $44,938,312.25 and incurred reasonable and necessary costs to transport and sell the

Defendant Properties in the amount of $18,256,914.58.  *See* Notice of Filing (ECF No. 30). Accordingly, the net proceeds of the interlocutory sale, $26,681,397.67 before interest, constitute the substitute res in this matter.  *See* Fed. R. Civ. P. Supp. R. ("Supp. R.") G(7)(b)(iv).  The United States is holding the substitute res in an interest-bearing account pending the conclusion of this action as per the requirements of the Court's Order.  *See* Order (ECF No. 10); Notice of Filing (ECF No. 30).

On July 28, 2020, after identifying all known potential claimants to the Defendant Properties, the United States sent notices of this action and copies of the complaint to Mobin International and Mahmoud Madanipour via email.  On August 1, 2020, the United States additionally sent notice of this action and a copy of the complaint to Madanipour by WhatApps instant messaging service.  *See* Affidavit for Default (ECF No. 27) ¶ 6.  In response to the direct notice, the potential claimants had to file a verified claim with this Court within 35 days of the service.  *See* Fed. R. Civ. P. Supp. G(4)(b)(ii)(B). On July 29, 2020, the United States began posting notice of this forfeiture action on an internet site, http://www.forfeiture.gov, for 30 consecutive days.  *See* Decl. of Publication (ECF No. 26).  Any verified claim in response to the notice by internet publication had to be filed no later than September 27, 2020.  *See* Supp. R. G(5)(a)(ii)(B).

Three entities, Mobin International, Oman Fuel, and Sohar Fuel Trading LLC FZC (collectively, the "Mobin Claimants"), filed a joint claim for the Defendant Properties on September 22, 2020, *see* Verified Claim (ECF No. 11), and subsequently moved to dismiss the verified complaint on September 22, 2020, *see* Mot. to Dismiss (ECF No. 13).  On December 30, 2020, counsel for the Mobin Claimants moved to withdraw from the case.  *See* Mot. to Withdraw (ECF No. 23).  This Court granted the motion to withdraw on January 18, 2021, ordering that

Mobin Claimants "must find new counsel since entities must be represented." *See* Minute Order of Jan. 18, 2021. On March 4, 2020, the Court denied the Mobin Claimants' motion to dismiss without prejudice for want of prosecution. *See* Minute Order of Mar. 4, 2021.

Aside from the Mobin Claimants, no other party filed a claim in this action, and the Mobin Claimants failed to prosecute their claim in this action. As such, on April 29, 2021, the Clerk of Court entered default against the Defendant Properties. *See* Entry of Default (ECF No. 29). This case is now ripe for default judgment.

## STANDARD FOR ENTRY OF DEFAULT JUDGMENT

Federal Rule of Civil Procedure ("Rule") 55 sets out a two-step process for the entry of a default judgment. First, the Rule 55(a) provides that the Clerk shall enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise[.]" Fed. R. Civ. P. 55(a). Second, "[u]pon request of the party entitled to default, Rule 55(b)(2) authorizes the court to enter against the defendant a default judgment for the amount claimed and costs." *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass*, 635 F. Supp. 2d 21, 24 (D.D.C. 2009). Default judgment is equally available in forfeiture actions. *United States v. All Assets Held in Account No. 80020796 ("All Assets")*, 330 F. Supp. 3d 150, 156 (D.D.C. 2018) ("This form of relief is no less appropriate when the defendant in question is property.").

A plaintiff is only entitled to a default judgment if the allegations of the complaint, if true, are legally sufficient to state a claim for relief. *Gutierrez v. Berg Contr., Inc.*, Civ. A. No. 99-3044, 2000 U.S. Dist. LEXIS 9776, at *4 (D.D.C. Mar. 20, 2000) ("[A] district court may still deny an application for default judgment where the allegations of the complaint, even if true, are legally insufficient to make out a claim.") (citations omitted); *United States v. $1,071,251.44 of Funds*

*Associated with Mingzheng Int'l Trading Ltd. ("Mingzheng Int'l")*, Civ. A. No. 17-1166, 2018 U.S. Dist. LEXIS 138071, at *8 (D.D.C. June 29, 2018) ("[A] notation of default against a defendant does not automatically entitle a plaintiff to a default judgment; instead, 'the defendant['s] default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief.") (quoting *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26-27 (D.D.C. 2008)).  A complaint must allege sufficient facts to " to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supp. Rule G(2)(f).  This standard is "not particularly onerous."  *Mingzheng Int'l*, 2021 U.S. Dist. LEXIS 103998, at *12*. Moreover, in this assessment of whether the plaintiff has stated a legally sufficient claim, the defendant is deemed to have admitted all well-pleaded allegations in the complaint.  *See United States v. Oil Tanker Bearing Int'l Mar. Org. (IMO) No. 9116512 ("Grace 1")*, 480 F. Supp. 3d 39, 43 (D.D.C. 2020) ("Once default is entered, the defendant 'is deemed to admit every well-pleaded allegation in the complaint.'") (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)).

"The determination of whether a default judgment is appropriate is committed to the sound discretion of the trial court."  *Grace 1*, 480 F. Supp. 2d at 43 (citations and internal quotation marks omitted).  "Although '[d]efault judgments are not favored by modern courts,' they may be appropriate 'when the adversary process has been halted because of an essentially unresponsive party.'"  *All Assets*, 330 F. Supp. 3d at 155-56 (quoting *Jackson v. Beech*, 636 F.2d 831, 835-836 (D.C. Cir. 1980)).

## DISCUSSION

The United States is entitled to entry of a default judgment against Defendant Properties. The United States demonstrated by declaration that any potential claimants to the Defendant Properties failed to plead or otherwise defend this action, and thus the Clerk of Court appropriately entered default in accordance with Rule 55(a).  Moreover, the well-pleaded allegations of the

complaint support a reasonable belief that the United States will be able to meet its burden of proof at trial that the Defendant Properties are subject to forfeiture. Accordingly, default judgment is appropriate. *See, e.g.*, *United States v. $9,928.00 in U.S. Currency ("$9,928.00")*, Civ. A. No. 10-1728 (PLF), 2012 U.S. Dist. LEXIS 41103, at *3-4 (D.D.C. Mar. 27, 2012) ("The Court finds that the verified complaint for forfeiture *in rem* states a factual and legal basis for forfeiture. Further, no defense to the forfeiture having been interposed, and no opposition having been made to the motion for entry of a default judgment, the motion will be granted, and a final order of forfeiture will be issued."); *United States v. $4,620 in U.S. Currency ("$4,620")*, 779 F. Supp. 2d 65, 67 (D.D.C. 2011) ("The Court finds that the defendant property was used or intended to be used to facilitate a violation of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq*. The defendant property therefore is forfeitable to the government under 21 U.S.C. § 881(a)(6). Further, the government provided sufficient notice of the seizure of the defendant property. No individual other than Mr. Campbell filed any pleading to challenge the forfeiture of the defendant property, and the time for filing a claim has expired. And the Court has stricken Mr. Campbell's claim— therefore, there are no claimants to the defendant property.").

## A.    <u>Jurisdiction</u>

The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1355(a), which provides that district courts "have original jurisdiction . . . of any action or proceeding for . . . forfeiture, pecuniary or otherwise, incurred under any Act of Congress." *See Grace 1*, 480 F. Supp. 3d at 43. The Court also has jurisdiction under 28 U.S.C. § 1345, which provides for jurisdiction over proceedings commenced by the United States. *Id.*

B.    **Notice**

The United States satisfied its notice obligations under Rule G(4) of the Supplemental Rules.   Supplemental Rule G requires the government to: (1) publish public notice of a forfeiture; and (2) provide direct notice to potential claimants of the property to be forfeited.  *See* Supp. R. G(4)(a), (b).  The government may satisfy the publication requirement by publishing the notice on an official government forfeiture website for at least thirty consecutive days.  *See* Supp. R. G(4)(a)(iii)-(iv).  The publication must "describe the property with reasonable particularity," "state the times . . . to file a claim and to answer," and "name the government attorney to be served with the claim and answer."  Supp. R. G(4)(a)(ii).  The government must also "send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant."  Supp. R. G(4)(b)(i).  That notice "must be sent by means reasonably calculated to reach the potential claimant."  Supp. R. G(4)(b)(iii)(A).   "Reasonable notice … requires only that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice."  *Valderrama v. United States*, 417 F. 3d 1189, 1197 (11th Cir. 2005) (citation omitted); *see also United States v. Funds Up to & including the Amount of $56,634 in U.S. Currency on Deposit in Banesco Int'l*, 79 F. Supp. 3d 112, 114 (D.D.C. 2015) (finding that notice was adequate where the United States attempted to obtain the account holder's contact information and posted public notice on the government's forfeiture website); *Lewis v. United States*, Civ. A. No. 14-0496, 2014 U.S. Dist. LEXIS 162213, at *17 (S.D. Cal. Nov. 3, 2014) ("[W]here the government attempted to provide notice and heard nothing back indicating that anything had gone awry, courts have found the government's efforts comply with due process.") (citations and internal quotation marks omitted).  Moreover, "[a] potential claimant

15

who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice."  Supp. Rule G(4)(b)(v).

In this case, the United States satisfied its notice obligations by publishing notice of this action on the government's forfeiture website for 30 consecutive days and by sending direct notice to known potential claimants.  *See* Decl. of Publication (ECF No. 26); Aff. for Default (ECF No. 27).  The notice: (1) identified the Defendant Properties as "all petroleum product aboard" the Bella, Bering, Pandi, and Luna and provided the IMO numbers for those vessels; (2) stated the applicable times for filing a claim and an answer; and (3) identified an Assistant United States Attorney as the appropriate person to be served with a claim and answer.  Decl. of Publication (ECF No. 26) at 3.

The United States also sent direct notice of this action to known, potential claimants.  On July 28, 2020, the United States sent notices of this action and copies of the complaint to Mobin International and Mahmoud Madanipour via email.  On August 1, 2020, the United States additionally sent notice of this action and a copy of the complaint to Madanipour by WhatApps instant messaging service.  *See* Affidavit of Default (ECF No. 27) ¶ 6.  On August 2, 2020, the United States confirmed that its WhatsApp message had been read.  *See id.*  The Clerk of Court determined that the United States satisfied its notice obligations when it entered default in this matter.  *See* Entry of Default (ECF No. 29).

## C.    Adequacy of the Complaint

The United States has also satisfied the other requirements for a complaint in a forfeiture action in rem, as outlined in Supplemental Rule G.  In addition to the notice requirements discussed above, the complaint must be verified, state the grounds for jurisdiction and venue, describe the property with reasonable particularity, identify the statute under which the forfeiture action is

brought, and state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.  Supp. R. G(2).  Here, the complaint is verified, *see* Compl. at 13, it identifies the basis for jurisdiction and venue, *id.* ¶¶ 3-5, and it describes the property at issue by providing the names and IMO numbers of the vessels carrying the petroleum products in question, *id.* at 1.  The complaint also identifies the provision under which forfeiture is sought as 18 U.S.C. § 981(a)(1)(G)(i), which permits forfeiture of all assets, foreign or domestic, affording any person a source of influence over any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property.  *Id.* ¶ 2.

## I.    The United States has sufficiently alleged that the Defendant Properties are subject to forfeiture.

Moreover, the complaint alleges sufficiently detailed facts to support a reasonable belief that the United States would be able to establish at trial that the Defendant Properties grant a source of influence over the IRGC, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5), and are therefore subject to seizure and forfeiture under 18 U.S.C. § 981(a)(1)(G)(i).

### a.    The United States has adequately alleged that the IRGC, including the IRGC-QF, has planned or perpetrated a federal crime of terrorism.

First, the IRGC, including the IRGC-QF, constitutes an entity engaged in planning or perpetrating a federal crime of terrorism.  Under 18 U.S.C. § 2332b(g)(5), a "federal crime of terrorism" means an offense that: (1) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and (2) is a violation of, among other things, 18 U.S.C. § 2339B, which concerns the provision of material support to "terrorist organizations."  Under 18 U.S.C. § 2339B(g)(6), "the term 'terrorist organization' means

an organization designated as a terrorist organization under section 219 of the Immigration and

Nationality Act."  In assessing whether an entity constitutes a "Foreign Terrorist Organization"

under Section 219 of the INA, the Secretary of State considers whether: (1) the entity is a foreign

organization; (2) the entity has engaged in terrorist activity, as defined in section 212(a)(3)(B) of

the INA (8 U.S.C. § 1182(a)(3)(B)), or terrorism, as defined in section 140(d)(2) of the Foreign

Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)), or retains the

capability and intent to engage in terrorist activity or terrorism; and (3) the entity's terrorist activity

or terrorism threatens national security (national defense, foreign relations, or the economic

interests) or the security of U.S. nationals.  *See* https://www.state.gov/foreign-terrorist-

organizations/.  Thus, in designating an entity as a Foreign Terrorist Organization under Section

219 of the INA, the Secretary of State also, necessarily, finds that the conduct is calculated to

influence or affect the conduct of government by intimidation or coercion, therefore meeting both

prongs of the definition of "federal crime of terrorism" under 18 U.S.C. § 2332b(g)(5), and

automatically falling within the scope of 18 U.S.C. § 98l(a)(l)(G)(i).  *See United States v. Puerta*,

249 F. App'x 359, 360 (5th Cir. 2007) (defendant's conviction fell squarely within the definition

of a "federal crime of terrorism" in § 2332b(g)(5), because he provided material support to a

"designated foreign terrorist organization" in violation § 2339B).

In this case, as discussed above, the Secretary of State designated the IRGC, including the

IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA on April 15, 2019.

*See* Compl. ¶ 8; 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/documents/

2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-

corps-and-other-aliases-as-a.  In making this finding, the Secretary of State necessarily had to

conclude that the IRGC's terrorist activity threatens national security or the security of U.S.

nationals, and therefore this designation fulfills both prongs of the definition of a federal crime of terrorism.

As discussed above, OFAC similarly designated both the IRGC and the IRGC-QF under E.O. 13,224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx; https://www.treasury. gov/press-center/press-releases/Pages/sm0177.aspx. In designating the IRGC-QF, OFAC concluded that "[t]he Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan," and that by providing such assistance through the IRGC-QF, "Iran is seeking to inflict casualties on U.S. and NATO forces," further demonstrating that the IRGC-QF's terrorist activities are intended to influence the conduct of government by intimidation or coercion. https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx.

This court has previously deferred to the Secretary of State's designation of the IRGC as a Foreign Terrorist Organization and found that the IRGC constitutes an entity that is necessarily engaged in planning or perpetrating a federal crime of terrorism for purposes of 18 U.S.C. § 98l(a)(l)(G)(i). *See Grace 1*, 480 F. Supp. 3d at 45 ("The Court agrees that, at least in this instance, it is appropriate to defer to the Secretary of State's and OFAC's findings that IRGC is engaged in terrorist activity and is thus subject to 18 U.S.C. § 981(a)(1)(G)(i)."). In light of the Secretary of State's designation, the United States submits that it has adequately alleged that the IRGC and IRGC-QF have engaged in a federal crime of terrorism.

        b.    The United States has adequately alleged that the Defendant Properties <u>provide a source of influence over the IRGC, including the IRGC-QF.</u>

Second, the United States has also adequately alleged that the Defendant Properties provide a source of influence over the IRGC, including the IRGC-QF. Although there is little case law

exploring the definition or scope of the "source of influence" provision under 18 U.S.C. § 981(a)(1)(G)(i), Congress used similar "source of influence" language in the RICO forfeiture statute, 18 U.S.C. § 1963(a). In RICO-based forfeitures, courts consider whether the property was "used to further the affairs of the enterprise," or "made the prohibited conduct less difficult or more or less free from obstruction or hindrance." *See United States v. Neff*, 303 F. Supp. 3d 342, 349 (E.D. Pa. 2018) (internal quotation marks and citation omitted).

Here, the United States has alleged that the IRGC, including the IRGC-QF, uses the sale of Iranian petroleum to fund its terrorism activities and that such sales do not merely grant a "source of influence" over the IRGC, but that they constitute a "financial lifeline." Specifically, the verified complaint alleges that the IRGC maintains extensive economic interests in the petroleum industry, Compl. ¶ 8, that the petroleum products sold by the IRGC-QF originate with NIOC, *id.* ¶ 11, that NIOC is an agent or affiliate of the IRGC, *id.* ¶ 6, that the IRGC-QF relies on the shipping industry to transport petroleum products, *id.* ¶ 11, that the IRGC-QF relies on a complex network of intermediaries to obfuscate its involvement in selling Iranian oil, *id.* ¶ 12, that the profits from the IRGC's involvement in the petroleum industry fund its terrorist activities, *id.* ¶¶ 8, 10, and that the petrochemical sector provides a financial lifeline to the IRGC, *id.* ¶ 9.

The United States further alleged facts sufficient to demonstrate that the sales of the Defendant Properties were controlled by the IRGC, and thus part of the terror group's "financial lifeline." Specifically, the United States alleged, among other things, that Mahmoud Madanipour arranged to ship the Defendant Properties on behalf of Mobin International, Compl. ¶ 15, that Madanipour is affiliated with the IRGC, *id.*, that Mobin International chartered the Bella, Bering, Luna, and Pandi to ship the Defendant Properties, *id.* ¶¶ 32-35, that Mobin International is associated with bank accounts also used for IRGC funds, *id.* ¶ 18, that Mobin International retained

Seawaves Shipping, an Iranian company that is associated with the IRGC-QF, to act as its agent in transporting the Defendant Properties, *id.* ¶¶ 25-26, and that a bill of lading for Defendant Property 3 identified NIOC and/or its subsidiary, NIOPDC, as the shipper, *id.* ¶ 28.

These facts support a reasonable belief that the IRGC, including the IRGC-QF, traded in petroleum products, including the Defendant Properties, "to further the affairs of the enterprise" and thus the Defendant Properties constitute a source of influence over an entity that has engaged in a federal terrorism offense. Indeed, the Court found similar facts sufficient when it ruled in *Grace 1* that funds related to another scheme to assist the IRGC "in selling oil in evasion of U.S. trade and economic sanctions" were sources of influence as the funds were "likely used to further the affairs of the enterprise and to make the IRGC's prohibited conduct less difficult[.]" *Grace 1*, 480 F. Supp. 39 at 42-43, 46. Moreover, in issuing the warrant for arrest in rem, this Court previously found by probable cause that the Defendant Properties were subject to forfeiture. *See* Order (ECF No. 5) (issuing warrant). The affidavit in support of the warrant for arrest alleged the same facts alleged in the verified complaint. Notably, however, the reasonable belief standard applicable to this motion for default judgment is substantially lower than probable cause.

Further, on October 26, 2020, after the United States filed the complaint in this case, OFAC designated Mobin International pursuant to Executive Order 13,224 for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the NIOPDC. *See* https://home.treasury.gov/news/press-releases/sm1165. In explaining the designation of Mobin International, OFAC cited Mobin International's agreement to sell NIOC gasoline—the Defendant Properties—to the Maduro regime in Venezuela. *Id.* In the very same action, OFAC designated NIOC "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF."

*Id.* Courts have previously granted deference to such OFAC findings. *See, e.g., In re 650 Fifth Ave. & Related Props.*, Civ. A. No. 08-10934, 2013 U.S. Dist. LEXIS 79667, at *21 (S.D.N.Y. June 6, 2013) ("These findings are entitled to deference. OFAC has been delegated the authority to administer the SDN listing regime, and the Court must therefore give effect to its informal adjudications, unless they are 'plainly inconsistent' with the relevant statutes and OFAC regulations. Given OFAC's unique expertise in matters of terrorist finance and the sensitive nature of the investigations upon which OFAC makes its determinations, it is entitled to deference even greater than that afforded an administrative agency statutory interpretation under *Chevron*.") (citations omitted).

For all of these reasons, the United States has adequately stated its claim for forfeiture under 18 U.S.C. § 981(a)(1)(G)(i) and is entitled to the entry of default judgment.

\*    \*    \*

## <u>CONCLUSION</u>

For the foregoing reasons, and upon consideration of the record in this case, including a showing of compliance with applicable rules regarding service of process and notice by publication, the default entered by the Clerk of the Court, and taking the well-pleaded allegations of the Complaint as true, the United States respectfully requests that its motion for entry of default judgment be granted.  A proposed order accompanying the motion is attached.

Dated: July 30, 2021
      Washington, DC

Respectfully submitted,

CHANNING D. PHILLIPS, D.C. Bar #415793
Acting United States Attorney


By:             */s/ Michael P. Grady*
      MICHAEL P. GRADY
      BRIAN P. HUDAK
      Assistant United States Attorneys
      555 Fourth Street, NW
      Washington, DC 20530
      (202) 252-7566 (main line)

*Attorneys for the United States of America*